CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED
08/13/2026
LAURA A. AUSTIN, CLERK
BY: /s/ Amy Fansler
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| TOMMY H., Plaintiff, | ) ) ) | Civil Action No. 5:25-cv-00080 |
| v. | ) ) | REPORT & RECOMMENDATION |
| FRANK BISIGNANO, Commissioner of Social Security, Defendant. | ) ) ) | By: Joel C. Hoppe United States Magistrate Judge |

Plaintiff Tommy H. asks this Court to review the Commissioner of Social Security's final decision denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. ECF No. 1. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record ("R."), ECF No. 8, the parties' briefs, ECF Nos. 15–16, and the applicable law, I find that substantial evidence does not support the denial of benefits. Accordingly, I respectfully recommend that the presiding District Judge reverse the Commissioner's decision and remand Tommy's case under the fourth sentence of 42 U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence in the existing record supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir.

2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). *See Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019). Substantial-evidence review considers the entire record and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, a court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## II. The Legal Framework

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine if a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. "At step five, the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy,' considering the claimant's residual functional capacity, age, education, and work experience." *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015) (quoting 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c)(2), 416.1429); *accord* 20 C.F.R. §§ 404.1520, 404.1560, 404.929. "If the Commissioner meets [this] burden, the ALJ finds the claimant not disabled and denies the application for benefits." *Mascio*, 780 F.3d at 635.

## III. Background

Tommy applied for DIB in October 2021. *See* R. 203–06. He alleged that he had been disabled since December 31, 2020, because of degenerative disc disease, herniated disc, and sleep apnea. *See* R. 239. Tommy was 26 years old, or a "younger person" under the regulations, on his alleged onset date. R. 70; *see* 20 C.F.R. § 404.1563(c). Medical experts under contract with Virginia Disability Determination Services ("DDS") found Tommy "not disabled" upon an initial review of his record in July 2022 and upon reconsideration review in June 2023. *See* R. 69, 89. On March 21, 2024, Tommy appeared with counsel and testified at a hearing before ALJ Peter Koclanes. R. 43–60. A vocational expert ("VE") also testified. R. 61–67.

ALJ Koclanes issued an unfavorable decision on May 20, 2024. R. 17–30. He found that Tommy had "severe" medically determinable impairments ("MDIs"), including lumbar degenerative disc disease, obesity, positive antinuclear antibody ("ANA") peripheral neuropathy,

polyneuropathy, and gout. R. 20. These impairments did not meet or equal any relevant listing. R. 21–23 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.15, 1.18. 4.00, and 11.14).

ALJ Koclanes then evaluated Tommy's residual functional capacity ("RFC") based on the medical and other evidence in his record. *See* R. 23–28. He found that Tommy could sustain

> sedentary work as defined in 20 CFR [§] 404.1567(a)[1] with lifting and/or carrying up to 10 pounds occasionally and less than 10 pounds frequently, *standing and/or walking up to 2 hours . . . except he must ambulate with a cane*; can never climb ladders, ropes, and scaffolds, kneel, or crawl; occasionally climb ramps and stairs, balance, stoop, and crouch; and [must] avoid concentrated exposure [to] hazards such as moving mechanical parts and unprotected heights, extreme hot and cold, and to pulmonary irritants such as fumes, odors, dusts, gases, poor ventilation.

R. 23 (emphasis added); *see* R. 26–28 (citations omitted). This RFC finding was "supported by [Tommy's] improvement with treatment; his examinations generally showing full or near full strength, range of motion, reflexes, and sensation and often normal, unassisted gait; and his reported activity during the period at issue." R. 28; *see* R. 26–27 (citations omitted). The ALJ also cited Tommy's "complaints of pain with standing and walking" and "lower extremity and back pain and instability," as well as physical exams "intermittently noting an antalgic gait or use of a cane" and "limited spinal range of motion and lower extremity strength," R. 26–27, to support his RFC findings that Tommy could stand and/or walk for up to two hours during an eight-hour workday and "would require the use of a cane for all ambulation," R. 27. *See* R. 26–28 (citations omitted).

---

[1] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a). "The full range of sedentary work requires that an individual be able to stand and walk for a total of approximately 2 hours during an 8-hour workday." SSR 96-9p 1996 WL 374185, at *6 (July 2, 1996). Using a "[m]edically required . . . hand-held assistive device to aid in standing or walking" may significantly reduce the individual's ability to meet these requirements. *See id.* at *7.

At step four, ALJ Koclanes found that Tommy's RFC prevented him from performing his past work as a mixer blender, tire technician, and building repairman. *See* R. 28. However, at step five, he credited the VE's testimony and found that Tommy's RFC and vocational factors allowed him to work as a toy stuffer (DOT 731.685-014), document preparer (DOT 249.587-018), and optical goods assembler (DOT 713.687-018). *See* R. 29–30 (citing R. 62–65). Accordingly, ALJ Koclanes concluded that Tommy was not disabled from December 31, 2020, through May 20, 2024. R. 29. The Appeals Council denied Tommy's request for review, R. 1–3, and this civil action followed.

IV. Discussion

Tommy argues that ALJ Koclanes's RFC assessment is flawed because the ALJ failed to explain why he limited Tommy to using a cane while walking but did not likewise limit Tommy to using a cane while standing. *See* Pl.'s Br. 15–18. Tommy testified at the hearing before the ALJ that he needs a cane while standing. *See id.* at 15 (citing R. 23). The ALJ found, however, that Tommy needs a cane only for "ambulat[ing]." *Id.* at 15 (quoting R. 23). Thus, the ALJ implicitly rejected Tommy's testimony that he needs a cane while standing. *See id.*

In his brief, Tommy argues that the record is "replete with evidence" indicating that he needs a cane while standing. *Id.* at 19. He points to his primary care doctor's opinion that he "need[s] a cane that is rated for his weight," *id.* (quoting R. 1262); records documenting falls and pain while standing without a cane, *see id.* at 17–19 (R. 275–76, 330, 371, 516, 525–26, 619, 637, 681, 716, 723, 763, 769, 776, 910, 913, 1246, 1267, 1570, 1792); and his own statements that he needs "to use a cane for walking & standing," *id.* at 19 (quoting R. 276).

Tommy also explains that his inability to stand without a cane "is material to the outcome of the case because the VE testified that if he required a cane for both walking and standing . . .

he would be unable to perform the sedentary jobs [that] the ALJ relied upon to deny [his] claim for disability at step five." *Id.* at 15 (citing R. 65–66). "Despite its outcome determinative importance, however, the ALJ failed to explain why he only included the use of a cane for ambulation in the RFC and not also for when [Tommy] is standing." *Id.* (citing R. 65–66). Tommy argues that this "lack of explanation requires remand." *Id.* at 17 (quoting *Mascio*, 780 F.3d at 640).

The Commissioner argues that the ALJ adequately explained his RFC finding because he acknowledged Tommy's testimony "that he could not stand or walk more than a few minutes at a time," but he nevertheless found that "greater exertional limitations were not consistent with the record." Def.'s Br. 7 (citing R. 27). In particular, the Commissioner emphasizes the ALJ's summary of evidence relevant to Tommy's ability to stand, including several of his treatment records and statements about his daily activities. *See id.* at 7–8 (citing R. 27). According to the Commissioner, "together with the ALJ's discussion, this evidence provides the support necessary to facilitate the Court's review." *Id.* at 8.

Tommy has the better argument. In assessing a claimant's RFC, the ALJ is required to consider the impact of any medically necessary "hand-held assistive device to aid in walking or standing," such as a cane. *See* SSR 96-9p, 1996 WL 374185, at *7. Here, the ALJ summarized certain evidence relevant to Tommy's use of a cane to aid in both exertional functions. Nowhere, however, did the ALJ "discuss or evaluate the issue of whether [Tommy's] use of a cane was medically necessary, and if so, the effect this requirement has on his RFC." *Curry v. Colvin*, No. 9:14-3883, 2015 WL 7965244, at *5 (D.S.C. Nov. 12, 2015). The ALJ instead concluded without explanation that Tommy needs a cane to walk, but not to stand. *See* R. 23, 27–28. Thus, the ALJ's assessment of Tommy's "use of a hand-held assistive device . . . failed to build 'an

accurate and logical bridge from the evidence to the conclusions' he reached regarding [Tommy's] RFC." *Daniel v. Berryhill*, No. 5:17cv338, 2018 WL 4134844, at *6 (E.D.N.C. July 13, 2018) (brackets omitted) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)).[2]

*A. The Legal Framework*

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for "8 hours a day, for 5 days a week, or an equivalent work schedule" despite his medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a holistic factual finding "made by the [ALJ] based on all the relevant evidence in the case record." *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam). In assessing the claimant's RFC, the ALJ must "identify the [claimant's] functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p, 1996 WL 374184, at *1. "Each function must be considered separately." *Id.* at *7. The ALJ must also include "a narrative discussion describing how the evidence supports each conclusion." *Id.* In other words, the ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion" about the claimant's work-related abilities. *Monroe*, 826 F.3d at 189 (citation omitted). Accordingly, "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). "The second component, the ALJ's logical explanation, is just as important as the other two" because "meaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." *Id.* (citation omitted).

*

[2] I do not address Tommy's remaining argument that the ALJ "failed to account for [his] need to lie down during the day in the RFC." Pl.'s Br. 20.

Hand-held assistive devices can impact a claimant's RFC because one or both of the claimant's upper extremities are unavailable for functions such as handling, gripping, lifting, carrying, pushing, and pulling when using the device. *See* 20 C.F.R. part 404, subpt. P, app. 1, § 1.00C6d, E4; SSR 96-9p, 1996 WL 374185, at *7. A claimant "who must use such a device for balance because of significant involvement of both lower extremities" may be unable to meet even the minimal strength demands of sedentary work. SSR 96-9p, 1996 WL 374185, at *7; *see Treli S. S. v. O'Malley*, No. 1:22cv3017, 2024 WL 489439, at *26–28 (D.S.C. 2024) (discussing the potential vocational impact of using a cane to balance when standing/walking). Thus, "ALJs must consider the impact of medically required hand-held devices, such as a cane or walker, when evaluating the claimant's RFC." *Tyroshelle Y. v. Comm'r of Soc. Sec.*, No. 4:24cv30, 2025 WL 2693736, at *7 (W.D. Va. Sept. 22, 2025) (cleaned up) (citing SSR 96-9p, 1996 WL 374185, at *7). "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device *to aid in walking or standing* and describing the circumstances for which it is needed." SSR 96-9p, 1996 WL 374185, at *7 (emphasis added). The "claimant bears the burden of establishing that a cane is medically necessary." *Lumpkin v. Comm'r of Soc. Sec.*, No. 4:17cv30, 2019 WL 1264890, at *4 (W.D. Va. Mar. 19, 2019) (citation omitted), *aff'd*, 800 F. App'x 210, 2011 (4th Cir. 2020) (per curiam). Self-reported cane use is relevant to the inquiry but insufficient, standing alone, to establish medical necessity. *See id.* ("There is a marked difference between Plaintiff's use of a cane and the medical necessity for one."). Likewise, "a prescription or the lack of a prescription" is relevant but "not necessarily dispositive of medical necessity." *Fletcher v. Colvin*, No. 1:14cv380, 2015 WL 4506699, at *8 (M.D.N.C. July 23, 2015) (citing *Staples v. Astrue*, 329 F. App'x 189, 191–92 (10th Cir. 2009)). In determining whether a hand-held assistive device is

medically necessary, the ALJ "must always consider the particular facts of the case." SSR 96-9p, 1996 WL 374185, at *7.

*B. Summary of Relevant Evidence*

*1. Treatment Notes*

On September 9, 2020, Tommy saw Christopher J. Hess, M.D., for an orthopedics appointment to address his chronic lower back pain and bilateral leg pain. R. 730. He explained that the pain "radiate[d] at times into [his] bilateral buttocks down the back of [his] legs." R. 731. A physical exam revealed tenderness to palpitation along the lumbar paraspinous muscles, decreased range of motion in the lumbar spine, non-antalgic gait, and 5/5 strength throughout the bilateral lower extremities. R. 732. Dr. Hess diagnosed Tommy with lumbar radiculitis. R. 730. He prescribed meloxicam 15mg once daily. *Id.* An MRI revealed left posterior lateral disc protrusion at L5-S1 with left lateral recess stenosis and disc desiccation at L2-L3. R. 748.

Tommy visited the emergency room after an incident on December 31, 2020, when he stood up from the couch and "experienced immediate pain in the low back." R. 723. He reported that the pain radiated across his back and occasionally down his legs. *Id.* The right leg was worse than the left leg. *Id.* Tommy told the attending doctor that he could stand up if he tried, but there was "about a 60% chance" that he would "go back down." R. 726. He was "in discomfort [even] when sitting down in [a] wheelchair." *Id.* A physical exam revealed "diffuse" tenderness along the lumbar musculature and limited range of motion in the back "due to pain." R. 724. An MRI of the lumbar spine revealed "mild" L1-2 and L2-3 degenerative disc disease. R. 725. The attending doctor prescribed tizanidine 4mg every eight hours as needed and discharged Tommy in a wheelchair. R. 725–26.

On January 11, 2021, Tommy told Dr. Hess that his symptoms had "worsened." R. 719.

He reported “sharp, jolting” pain in his lower back that radiated down his legs. *Id.* It was accompanied by a “burning” sensation and “numbness and tingling” in both legs. *Id.* Tommy told Dr. Hess that he had stood up “to get off of a bean bag” and “pain and weakness caused him to fall.” *Id.* A physical exam revealed tenderness to palpitation along the lumbar paraspinous muscles, decreased range of motion in the lumbar spine, antalgic gait, and 5/5 strength throughout the bilateral lower extremities. R. 720.

Tommy returned to Dr. Hess on January 27, 2021, and reported “constant” pain that continued to radiate down his legs. R. 716. The pain became “worse” when “going from sitting to standing, walking, [and] lifting his children.” *Id.* It became better with physical therapy, but the relief was “short lived.” *Id.* The pain was “accompanied by numbness/tingling in [his] legs.” *Id.* A physical exam revealed tenderness to palpitation along the lumbar paraspinous, decreased range of motion in the lumbar spine, non-antalgic gait, and 5/5 strength throughout the bilateral lower extremities. R. 717.

Tommy saw Ziad Yafi, M.D., on February 12, 2021, for an initial pain management appointment. *See* R. 330. He explained that he had started experiencing leg pain on December 31, 2020, in addition to his “longstanding” lower back pain. *Id.* The pain radiated “down the posterior aspect of both legs to the calf” and was “associated with numbness and tingling down the right leg.” *Id.* He told Dr. Yafi that his “leg gave out on him a couple times before.” *Id.* A physical exam revealed that Tommy weighed “closed to 500 pounds” and that there was trigger point tenderness over the lumbar paraspinal muscles bilaterally. R. 331. Tommy could “walk on his toes and heels without a problem,” and a motor, sensory, and deep tendon reflex exam of the lower extremities produced results “within normal limits.” *Id.* Straight leg raise was positive bilaterally. *Id.* Dr. Yafi performed an epidural steroid injection at L5-S1, noting that Tommy’s

pain had "persisted in spite of conservative management" including physical therapy, nonsteroidal anti-inflammatories, gabapentin, Flexeril, and CBD oil. *Id.*

At a follow-up appointment on March 12, 2021, Tommy told Dr. Yafi that he experienced "70 percent pain relief for 3 days and 40 percent pain relief for 3 weeks" after the epidural steroid injection the previous month. R. 1432. Dr. Yafi performed a second epidural steroid injection "in the hope of providing [Tommy] with pain relief and facilitating his daily activities, job performance, and continuation of physical therapy exercises." *Id.*

On October 21, 2021, Tommy saw Sudhir Rao, M.D., for a pain intervention consultation. *See* R. 371. He told Dr. Rao that his pain had "progressively worsen[ed]" and that he was experiencing "nearly constant . . . lightning strike pain, associated with numbness and lower extremity weakness." *Id.* He explained that the pain became worse with "standing, walking, and exercising." *Id.* The epidural steroid injections earlier that year provided only "temporary relief." *Id.* A physical exam revealed 4+/5 lower extremity strength bilaterally, positive straight leg raise, positive facet loading on lumbar extension, and sensation diminished to light touch and pinprick in the bilateral lower extremities. *Id.* A lumbar MRI revealed that the already "large" left posterolateral disc protrusion had "increased in size" since September 2020. *See* R. 391. It also revealed "severe" left lateral stenosis with "mild" asymmetric central canal stenosis. *Id.*

On November 9, 2021, Tommy saw Jennifer Cunningham, M.D., for an initial primary care appointment. *See* R. 390. He told her that his pain went "down into both of his legs" and that he was "afraid to walk too far because his legs feel like they may give out." *Id.* A physical exam revealed that Tommy's gait was antalgic. R. 392. Dr. Cunningham prescribed pregabalin 37.5mg once daily for nerve pain in his back. R. 394.

Tommy returned to Dr. Cunningham on January 31, 2022, because his lower back pain had become “progressively worse” over the last few weeks. R. 516. The pain was “so intense that he has to crawl in his house to get around.” *Id.* He told Dr. Cunningham that flexing his cervical spine causes a “sharp pain” in his neck that radiates down his legs like a “lightning bolt.” *Id.* The pain triggers “severe” headaches and dizziness. *Id.* Sometimes he “collapses,” but “he has not lost consciousness.” *Id.* Dr. Cunningham increased Tommy’s pregabalin dose to 100mg twice daily for his nerve pain and started him on prednisone 20mg three times daily. R. 519–20.

On February 4, 2022, Tommy saw Edward Lam, M.D., for a spine intervention appointment. *See* R. 619. His chief complaints were chronic axial lower back pain and recent bilateral lower limb numbness in the “midline lumbosacral,” “midline upper lumbar,” and “bilateral circumferential thigh, leg, [and] foot.” *Id.* He rated his pain at 9/10 and explained that the onset was sometimes “gradual” and sometimes “spontaneous.” *Id.* It was associated with numbness and tingling. *Id.* “Exacerbating factors include standing and walking.” *Id.* A physical exam revealed “severely” antalgic gait, “moderately restricted” lumbar range of motion, “circumferential nondermatomal paresthesia and numbness” in the bilateral lower limbs, 5/5 strength in the bilateral lower limbs, 4/5 left knee flexion and extension, and 4/5 right ankle aversion. R. 622. Dr. Lam deferred sustained hip flexion testing and straight leg raise “due to discomfort.” *Id.* An MRI revealed “mild” disc desiccation at L1-L2, “moderate” disc desiccation with posterior facet arthropathy at L2-L3, and left posterior lateral protrusion at L5-S1 with “mild to moderate” left lateral recess stenosis. R. 623. Dr. Lam assessed axial lower back pain consistent with herniated nucleus pulposus or intervertebral disc degeneration and bilateral lower limb numbness of “unclear etiology.” R. 624. He ordered updated imaging of the lumbar spine

and electrodiagnostic testing. *Id.*

On March 3, 2022, Tommy visited Neil W. Crowe, M.D. for electromyography ("EMG") and nerve conduction velocity ("NCV") testing. *See* R. 1669. The EMG/NCV results were "markedly abnormal," revealing evidence of "significant generalized axonal polyneuropathy." *Id.* Tommy explained that the "bilateral extremity pain, numbness and weakness had been going on for many years," and "the severity of leg symptoms worsened acutely 2 years ago." R. 1670. Dr. Crowe concluded that "bilateral lower extremity weakness is his most prominent symptom[]." *Id.*

Tommy returned to Dr. Lam for a follow-up appointment on March 10, 2022, to review diagnostic results. *See* R. 632, 635–36. An MRI of the lumbar spine revealed that the left posterolateral disc protrusion at L5-S1 had "decreased in size" since November 2021 while the associated "severe" left lateral recess stenosis remained. R. 636. "Mild" generative changes were present in the remainder of the lumbar spine. *Id.* A physical exam again revealed "severely" antalgic gait, "moderately restricted" lumbar range of motion, "circumferential nondermatomal paresthesia and numbness" in the bilateral lower limbs, 5/5 strength in the bilateral lower limbs, 4/5 left knee flexion and extension, and 4/5 right ankle aversion. R. 635. Dr. Lam concluded that Tommy's lower back pain was "most likely . . . stemming from" L5-S1 disc herniation. R. 638.

On April 22, 2022, Tommy told Dr. Cunningham that his leg and back pain were "not improving." R. 776. He was experiencing an "increase in lightheadedness" and "falling more frequently." *Id.* He estimated that he had "been falling about once every 2 days," and he was "worried that his legs are going numb." *Id.* On May 5, Tommy told Dr. Cunningham that he twisted his left ankle while walking and had pain at the "posterior aspect of the ankle" when bearing weight, which was aggravated by "direct pressure." R. 769. On June 7, he reported

"generalized pain and weakness," especially in his legs and arms, which had "gotten worse in the last couple weeks." R. 766. Tommy's gait was normal on that day's exam. R. 768. On June 8, Tommy told Dr. Cunningham that he had been experiencing right foot pain over "the past 4-5 days." R. 763. This time he exhibited an "abnormal" gait on exam. R. 764. He also exhibited "abnormal" gait on July 8. R. 925.

On August 4, 2022, Tommy visited Glenn E. Deputy, M.D. for a neurology appointment "to find out why his legs are so dysfunctional." R. 679. He explained that he had "no strength in his legs." *Id.* A physical exam revealed "diminished" vibratory sensation in the lower extremities, lower extremity strength at "4+ approximately and 4-/5 distally," and antalgic gait. R. 681. Dr. Deputy assessed "chronic pain" with "clear-cut lower extremity weakness of unclear etiology." R. 679 ("Weakness of both lower extremities."). On August 22, Tommy called Dr. Deputy's office and reported that "his knees buckle backwards whenever he applies normal weight," which "is making it impossible for him to work." R. 690.

On August 8, 2022, Tommy had a rheumatology appointment with Caleb Anderson, M.D. *See* R. 1246–47. He reported "weakness of the bilateral extremities" and explained that "at times [it] feels [as] if his legs cannot keep him up." R. 1246. A physical exam revealed musculoskeletal tenderness, weakness on bilateral hip flexion, and decreased range of motion and pain on bilateral straight leg raise. *Id.*

On September 30, 2022, Tommy saw Dr. Cunningham with complaints of "pain to his right ankle" and "some swelling [of] the ankle . . . for the last 3 days." R. 917. He rated his pain at 8/10 and explained that he felt "at times that [his] ankle will buckle on him." *Id.* Dr. Cunningham reviewed an MRI of the right foot and ankle that showed "significant marrow edema to the fifth metatarsal," "tiny incomplete avulsion fracture at the base," and "mild stress

changes . . . at the base of the third and fourth metatarsal underlying TMT cartilage loss." *Id.*; *see* R. 918. A physical exam revealed "tenderness" over the base of the fifth metatarsal and decreased range of motion in the left ankle. R. 918. Dr. Cunningham started Tommy on tramadol 50mg every six hours as needed for pain. R. 919. She also found that he "would likely benefit from a walking boot to offload pressure on the left foot" and sent him "to podiatry to be evaluated for the same." R. 918.

On November 2, 2022, Tommy visited Dr. Cunningham with complaints of "immobility" and "limited mobility due to pain." R. 913. He had "fallen a couple of times because of the pain and had to have friends help him off the floor." *Id.* He felt that his pain was "getting progressively worse." *Id.* The tramadol had "only helped a little[,] if at all." *Id.* Dr. Cunningham discontinued Tommy's tramadol and started him on hydrocodone-acetaminophen 5-325mg every eight hours as needed and duloxetine 60mg once daily for his pain. R. 914–16.

Tommy visited the emergency department on November 8, 2022, after "falling and striking [a] door frame and a shelf." R. 909. He explained that he "rose from his children's bed[,] walked out in the hallway[,] and then he fell forward." R. 910. He remembered "striking the frame" but was "amnestic after that." *Id.* The attending doctor assessed "traumatic injury" to the head, "contusion" to the face, and "abrasions" to the left side of the face "with some soft tissue swelling." R. 909, 911.

On November 10, 2022, Tommy called Dr. Cunningham's office to tell her that he had "passed out and fell" two days earlier and gone to the emergency department, where he "was diagnosed with a concussion." R. 1360. He wanted to know whether Dr. Cunningham recommended a "wheelchair, power chair, or cane." *Id.* Dr. Cunningham responded "that he does need a wheelchair," though she was "not sure if his home is wheelchair accessible." *Id.* She

would "send him to physical therapy to the wheelchair clinic." *Id.*; *see* R. 1359 ("Dr. Cunningham has placed an[] order for the wheelchair clinic."). On November 17, Tommy asked if Dr. Cunningham could "put an order in for him to get a cane as well." R. 1359.

On February 14, 2023, Tommy visited Dr. Anderson for another rheumatology appointment. *See* R. 1250. A physical exam revealed "limited ambulation and ambulation with [a] cane." *Id.*

On February 17, 2023, Tommy returned to the emergency department with "complaints of pain, redness, and swelling in [his] left foot beginning [the previous] Monday and becoming progressively worse." R. 1267. He explained that "the pain radiat[ed] from his heel into his left lower extremity." R. 1268. At this point, Tommy was taking one 325-5mg tablet of hydrocodone every eight hours as needed for pain. *Id.* He had "tripled [that] hydrocodone dosage and [was] taking his voltaren gel," but he was "now unable to ambulate without pain." R. 1268. He denied falling. *Id.* A physical exam revealed swelling and tenderness in the left ankle, left Achilles tendon, and left foot. R. 1269. Imaging of the left ankle revealed a calcaneal heal spur. R. 1271. Tommy was diagnosed with cellulitis, gout, fracture, calcaneal spur, dislocation, and deep vein thrombosis. R. 1273. The attending nurse ordered a "standard walker" for him. R. 1270; *see* R. 1306 ("Standard Walker ([Durable Medical Equipment])").

On February 22, 2023, Tommy saw Dr. Cunningham with complaints of "multiple joint aches and pains secondary to inflammatory arthritis." R. 1262. He asked "about getting a wheelchair though he [knew] that he should not be using it continually, he should be walking around the house." *Id.* He was "interested in obtaining one for when he goes out and about." *Id.* Dr. Cunningham said that Tommy "does need a cane that is rated for his weight." Imaging confirmed the presence of a "left calcaneal heel spur." R. 1265. Dr. Cunningham assessed plantar

fasciitis of the left foot and idiopathic chronic gout with tophus. R. 1266. She also noted that Tommy's existing diagnoses included degeneration of the lumbar intervertebral disc, muscle weakness, numbness, lumbosacral radiculopathy, morbid obesity, and bilateral leg weakness. R. 1263. Dr. Cunningham told Tommy they would "get [him] a cane and inserts" and "put in a referral for physical therapy, to send [him] to the wheelchair clinic." R. 1302 ("Ambulatory referral to Physical Therapy . . . Other ([Durable Medical Equipment])").

Tommy returned to Dr. Cunningham on March 22, 2023, and reported that he was experiencing "severe" back pain and that he was "no longer able to [do] day to day tasks." R. 1261. When asked about the activities of daily living that were affected by his conditions, Tommy said "everything." R. 1258. He said that his pain made his "legs turn into 'Jello-filled lightening sacs.'" *Id.* Dr. Cunningham prescribed another course of hydrocodone-acetaminophen 5-325mg every six hours as needed for pain and pregabalin 150mg twice daily. Later that day, Tommy told one of Dr. Cunningham's staff that Adapt Health "denied [his] . . . order for the quad cane because he exceeds the weight limit." R. 1256. She said she would check with another company. *Id.* Dr. Cunningham also placed another order for a wheelchair evaluation. R. 1572. Tommy would need the wheelchair for the rest of his life. *See id.* ("Length of Need: Lifetime").

On May 2, 2023, Tommy started physical therapy. *See* R. 1570. He explained that his lower extremities "give out on him without warning at times" and that he "requires assistance to get back up." *Id.* He had "his wife with him most of the time when getting in the shower to make sure [he did not] fall." *Id.* A physical exam revealed "general reduction" in lumbar active range of motion, "pain with mobility," and "decreased" lower extremity manual muscle testing. *Id.* The therapist noted they would work on "gait training" and other "neuromusculoskeletal" exercises. *See id.*

On July 20, 2023, Dr. Cunningham found that Tommy's gait was antalgic on physical exam. R. 1802. On August 24, Tommy told Dr. Cunningham that he had been experiencing pain to his left lower extremity and scrotum since he "walked at the fair" a few days earlier. R. 1977. "Walking increase[d] the pain," while it was improved "by laying down." *Id.* On October 17, Tommy reported an "increase" in his left leg and lower back pain "because his wife [] recently had [an] appendectomy," so "he was sleeping on a couch and . . . on the floor" and "had to do more with caring for the children." R. 1972. While Tommy had lost 30 pounds since August 2023, he reported that he had "not experienced any improvement in his low back pain." *Id.* Dr. Cunningham renewed Tommy's prescription for hydrocodone-acetaminophen 5-325mg for his "chronic left-sided low back pain," which remained "uncontrolled." R. 1974.

*2. Medical Opinions*

On initial review, DDS consultant Daniel Camden, M.D., found that Tommy could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. R. 75. He found that Tommy could stand and walk for a total of four hours in a workday. *Id.* Tommy's abilities to climb, balance, stoop, kneel, crouch, and crawl were also limited to varying degrees. *See id.* To support his findings, Dr. Camden pointed to Tommy's "severe" musculoskeletal problems, BMI over 60, and polyneuropathy in his lower extremities. *Id.* Dr. Camden also noted findings of antalgic gate, moderately restricted lumbar range of motion, spinal abnormalities on MRI imaging, and difficulty engaging in basic hygiene activities. R. 76. However, Dr. Camden noted that Tommy could "prepare meals, do household chores, go out alone, drive, and walk about 300ft before needing rest." R. 77.

On reconsideration, DDS consultant Jack Hutcheson Jr., M.D., adopted Dr. Camden's proposed functional limitations. *Compare* R. 84–85, *with* R. 75. However, Dr. Hutcheson found

that exams performed since DDS's initial review "reveal[ed] bilateral weakness and right foot pain." R. 83. He noted that Tommy reported "limitations in standing, sitting, [and] walking due to radiating bilateral lower extremity pain and swelling." *Id.* These limitations required Tommy to make "adjustments to personal care due to difficulties in mobility and frequent falls." *Id.* Dr. Hutcheson explained that Tommy "was Rx'd a standard cane, but BMI is a contributing factor, and he requires a stronger offering." *Id.* He concluded that Tommy "would, presently, have an inability to sustain competitive work." *Id.* Nevertheless, the disability examiner on reconsideration concluded that Tommy was not disabled based on the medical-vocational guidelines. *See* R. 87–88 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.27).

On March 19, 2024, Dr. Cunningham wrote a letter about Tommy's impairments, symptoms, and functional limitations. *See* R. 1989–90. She opined that lumbar radiculopathy "is the major cause . . . of [Tommy's] disability." R. 1989. He experiences "pain to the low back with radiation into both of his legs." *Id.* "He was initially treated with tramadol," but the medication "lost its effectiveness." *Id.* Likewise, physical therapy and epidural steroid injections "did not help him substantially." *Id.* Tommy has suffered "several falls because of the pain," leaving him "unable to get up off of the floor independently." *Id.* "He has also had syncopal episodes that have contributed to the falls and are related to the pain." *Id.* Tommy is "morbidly obese," weighing 478 pounds with a BMI of 53.87. *Id.* "Because of his size, he has not been able to use an assistive device." *Id.* Dr. Cunningham opined that the "combination of lumbar radiculopathy and obesity" renders Tommy "extremely limited in what he can do" with "severely limited" range of motion. *Id.* For instance, he "often finds it difficult even to care for his own children" and "is unable to pick up his small children." R. 1989–90. He is also "limited" in his ability to "partake in an exercise program." R. 1989. Dr. Cunningham opined that "there is little

hope that [Tommy] will lose weight" without bariatric surgery, but "his wife is opposed to him proceeding with bariatric surgery." R. 1989–90. Moreover, Tommy "is not a candidate for surgical intervention" for his back. R. 1990.

*3. Tommy's Statements*

In a February 1, 2022, function report, Tommy stated that he cannot "sustain [himself] for more than three hours, even to do normal tasks like grocery shopping, before [his] legs give out." R. 247. He cooks complete meals "when able," but he cannot make dishes that require "long periods of standing or stirring." R. 248. "On a good day," he cooks a meal in "30-60 minutes." *Id.* But "on a bad day," it takes "twice that." *Id.* He helps with "general household cleaning," but only "occasionally" because it is "very strenuous and makes [him] have to lay down and recover." *Id.* He takes his kids outside once a week to play, but only if someone else is with him "in case [he] fall[s] or the kids run off." R. 249. He goes shopping for groceries and baby supplies once a week for about an hour. *Id.* His hobbies include video games and playing with toy cars with his kids. R. 250. He "usually" does not go out. *Id.* When he does, he "prefer[s] to have someone with [him]" in case he falls. *Id.* He "can only stand still for 20 minutes if [he's] lucky before [he] fall[s] or [has] to sit." R. 251. In the report, Tommy states that he uses a cane "from time to time," but he does not specify if it was prescribed or how he uses it. *See* R. 252.

In a February 2, 2023, function report, Tommy stated that he is "unable to work due to limited ability to sit, stand & walk for any length of time due to back pain." R. 275. His "right foot is painful on a daily basis," and his "doctor suggested that [he] use a cane daily for support." *Id.* His "legs down to [his] feet go numb and are painful on a daily basis." *Id.* He experiences "frequent falls due to pain and poor stability." *Id.* His family members handle most of the child and pet care because he "must use a cane when walking & standing." *See* R. 276. Standing to

shower exacerbates his back, bilateral leg, and right foot pain, and his wife helps him shower "due to pain & poor stability." *Id.* He used to "cook a lot," but now he is "unable" to do so because of his "back pain, bilateral leg pain, right foot pain, difficulty standing," and "use [of] a cane for stability." R. 277. His "wife and father take care of all household chores indoors & outdoors" because of his "poor stability, cane use, back pain, bilateral leg pain & swelling, [and] right foot pain." *Id.* He accompanies his wife shopping once per week, but he has to "use [his] cane" or a "motorized scooter" to maintain "stability." R. 278. He is "unable to stand . . . for any length of time without pain." R. 279. In the report, Tommy states that he was prescribed a cane and a wheelchair. *See* R. 281. He uses the cane "daily" and the wheelchair "when [his] pain is most severe." *Id.*

*4. The VE's Testimony*

The VE testified that a hypothetical person with the same RFC as Tommy could work as a toy stuffer, document preparer, and optical goods assembler. *See* R. 62–54; *see also* R. 23. Tommy's attorney then asked the VE: "[I]f a cane is needed for *standing and walking*, is that going to impact their ability to do those sedentary jobs?" R. 65–66 (emphasis added). The VE responded: "It would, in a sense of the cane being utilized for balance, as well. And these jobs all require bilateral use of the upper extremities. So, in that respect, it would rule out the jobs." R. 66.

*C. The ALJ's Decision*

In determining Tommy's RFC, ALJ Koclanes acknowledged Tommy's testimony that he requires a cane while standing for more than ten or twenty minutes:

> [Tommy] reported having numbness and weakness in his legs and stated that he used a cane regularly due to concerns about his left leg giving out. He testified that he was limited to standing for 10 to 20 minutes at a time by his back and leg pain and he reported that his feet were painful to walk on. He stated that he had been

> referred to physical therapy for evaluation for a wheelchair or rollator walker, but indicated that he was unable to complete the physical therapy program due to insurance limitations. He reported that several of his canes had broken due to his weight and indicated that he had a history of falls despite cane use. He stated that he used the cane any time he needed to take more than 5 steps or stand more than briefly.

R. 23–24; *see also* R. 22 ("The claimant endorsed foot pain and lower extremity numbness and weakness and reported using a cane when standing or walking."). He concluded that Tommy's MDIs "could reasonably be expected to cause the alleged symptoms," but that his statements about "the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the ALJ's] decision."

ALJ Koclanes found that Tommy's "statements . . . are inconsistent because the record is more consistent with finding less restrictive limitations." R. 26. He provided the following explanation for his finding:

> The claimant's *complaints of pain with standing and walking and his examinations intermittently noting an antalgic gait or use of a cane support finding him limited to sitting, standing, and walking at the sedentary level* and occasionally climbing ramps and stairs, balancing, stopping, and crouching. *While the claimant asserted that he could not stand or walk more than a few minutes at a time, greater exertional limitations are not consistent with the claimant's treatment records showing periods with few musculoskeletal complaints* and full or near full strength, range of motion, reflexes, sensation, and coordination *and often unremarkable, unassisted gait*. [R. 331–32, 371, 388–89, 392, 517, 622, 635, 681, 707, 717, 720, 760, 764, 771, 777, 790, 905, 914, 1246, 1264, 1269–70, 1763, 1677, 1802, 1857, 1880, 1905, 1973, 1978]. Th[is] finding is further supported by the claimant's statements regarding his ability to walk while shopping for groceries on a weekly basis, go to a fair, prepare meals, and do housework. [R. 246–53, 274–82, 1977].

R. 26–27 (emphasis added). Further, although Tommy

> was often able to ambulate normally without the use of an assistive device during appointments across much of the period at issue, *his complaints of lower extremity and back pain and instability*, his elevated BMI, *and his occasional use of a cane or limited spinal range of motion and lower extremity strength* during treatment visits *support finding he would require the use of a cane for all ambulation.*

R. 27 (emphasis added). ALJ Koclanes did not find that Tommy needed a cane for standing. *See* R. 23, 26–28.

*D. Analysis*

"When the record reflects a [claimant's] frequent use of an assistive device, an ALJ's failure to explain the device's omission from the RFC or to provide a narrative discussion on whether the assistive device is medically necessary, leaves a reviewing court to guess about how the ALJ reached [his] conclusion." *Randall W. v. Saul*, No. 3:19cv911, 2020 WL 6939728, at *6 (E.D. Va. Nov. 25, 2020) (citing *Smith v. Saul*, No. 7:19cv101, 2020 WL 3442327, at *6 (E.D.N.C. May 13, 2020)); *accord Campbell v. Berryhill*, No. 5:17cv572, 2019 WL 1140228, at *2 (E.D.N.C. Mar. 12, 2019) ("There was ample evidence in the record to support plaintiff's claim that she needed to use a cane, . . . but the ALJ did not explain why the use of a cane was not included in the plaintiff's RFC."); *Brown v. Colvin*, No. 1:15-3686, 2016 WL 3355630, at *10 (D.S.C. June 17, 2016) ("[T]he ALJ's failure to acknowledge evidence that Plaintiff required a cane and to determine whether the cane was medically necessary resulted in an RFC finding that was not supported by substantial evidence."); *McLaughlin v. Colvin*, No. 1:12cv621, 2014 WL 12573323, at *2 (W.D.N.C. July 25, 2014) (explaining that the ALJ "must offer sufficient reasons supporting the determinations concerning the cane").

In this case, the record contains significant medical documentation indicating that Tommy may require a cane to mitigate pain and prevent falls while standing or walking. *Cf. Virginia F. v. Saul*, No. 4:19cv26, 2020 WL 6737876, at *7 (W.D. Va. Nov. 13, 2020) (finding hand-held assistive device medically necessary based on claimant's repeated falls, loss of consciousness, and imbalance). In her medical source letter, Dr. Cunningham explained that Tommy suffered "several falls because of pain" and "syncopal episodes . . . related to the pain,"

but his weight prevents him from relying on his current "assistive device." R. 1989. Dr. Hutcheson likewise explained that Tommy experiences "difficulties in mobility and frequent falls," and although he was "Rx'd a standard cane," he "requires a stronger offering." R. 85.

Various treatment notes corroborate these medical source statements. In November 2021, Tommy ended up in the emergency department with a traumatic head injury, contusion, and facial abrasions after he fell in the hallway of his home and struck a door frame. *See* R. 909–11. Tommy saw Dr. Cunningham days later, and she referred him to a wheelchair clinic after determining he "needs a wheelchair." R. 1359–60. He was ultimately prescribed a wheelchair for his "lifetime." *See* R. 1572. In February 2023, Tommy returned to the emergency department with complaints of progressively worsening left ankle pain, and the attending provider prescribed him a walker after diagnosing him with gout, fracture, calcaneal spurs, and dislocation. *See* R. 1270, 1273, 1306. At a follow-up appointment later that month, Dr. Cunningham found that Tommy "need[s] a cane rated for his weight," noting his diagnoses of plantar fasciitis, idiopathic chronic gout with tophus, lumbar intervertebral disc degeneration, lumbosacral radiculopathy, morbid obesity, and numbness and muscle weakness in the bilateral lower extremities. R. 1262–63, 1266. In March 2023, Adapt Health "denied [Tommy's] . . . order for [a] quad cane because he exceeds the weight limit," but suggested another possible supplier.[3] R. 1256.

Thus, Tommy "provided sufficient medical documentation supporting his need for a cane to at least warrant discussion of the issue by the ALJ." *Randall W.*, 2020 WL 6939728, at *7 (citing *Fletcher*, 2015 WL 4506699, at *8–9). Yet "the ALJ failed to expressly analyze the

[3] A "quad cane," or a four-pointed cane, is often used to assist with balance. *See, e.g.*, *Vanessa L. v. O'Malley*, No. 5:23cv660, 2024 WL 3717517, at *1 (S.D.W. Va. Aug. 8, 2024) ("The ALJ also noted that with the use of the quad cane, Plaintiff no longer experienced falls." (cleaned up)); *Darlene W. v. Kijakazi*, No. 3:20cv61, 2022 WL 594397, at *7 (W.D. Va. Feb. 28, 2022) ("Dr. Rubendall . . . prescribed a four-point quad cane for gait stability.").

*medical necessity* of [a] cane" for standing or walking. *Id.* at *6 (emphasis added). Indeed, it is unclear from the ALJ's general reference to Tommy's "assert[ions] that he could not stand or walk more than a few minutes at a time," R. 26–27, whether the ALJ considered the medical necessity of a cane or weighed the credibility of Tommy's statements and the corroborating evidence on this issue. *Cf. Fletcher*, 2015 WL 4506699, at *9 ("The ALJ in this case failed to explicitly address whether Plaintiff's need for a walker was medically necessary and, at most, seems to tacitly reject the notion that it could be.").

The Court cannot, as the Commissioner urges, accept the ALJ's general explanation that "greater exertional limitations are not consistent with the claimant's treatment records showing periods with few musculoskeletal complaints and full or near full strength, range of motion, reflexes, sensation, and coordination and often unremarkable, unassisted gait." R. 27. To begin with, the ALJ mischaracterizes the record. Tommy consistently reported musculoskeletal complaints. *See, e.g.*, R. 719 (January 2021: "pain and weakness caused him to fall"); R. 330 (February 2021: "leg gave out on him a couple times before"); R. 390 (November 2021: "afraid to walk too far because his legs feel like they may give out"); R. 516 (January 2022: "pain was so intense that he has to crawl in his house"); R. 776 (April 2022: "has been falling about once every 2 days"); R, 917 (September 2022: "feels at times that [his] ankle will buckle on him"); R. 1570 (May 2023: lower extremities "give out on him without warning").

Also contrary to the ALJ's characterization, the record includes numerous objective findings of antalgic gait and weakness, diminished sensation, and reduced range of motion ("ROM") involving both lower extremities. *See, e.g.*, R. 719 (January 2021: reduced lumbar ROM and antalgic gait); R. 371 (October 2021: diminished sensation and 4+/5 strength in bilateral lower extremities); R. 392 (November 2021: antalgic gait); R. 662 (February 2022:

reduced lumbar ROM, paresthesia and numbness in bilateral lower extremities, 4/5 left knee flexion and extension, 4/5 right ankle aversion, and “severely” antalgic gait); R, 635 (March 2022: reduced lumbar ROM, paresthesia and numbness in bilateral lower extremities, 4/5 left knee flexion and extension, 4/5 right ankle aversion, and “severely” antalgic gait); R. 681 (August 2022: diminished sensation and 4+/5 approximately and 4-/5 distally strength in bilateral lower extremities); R. 918 (September 2022: reduced left ankle ROM); R. 1250 (February 2023: limited ambulation requiring cane); R. 1570 (May 2023: reduced lumbar ROM and “decreased” lower extremity strength); R. 1802 (July 2023: antalgic gait).

Moreover, it is unclear how the cited “normal” findings “provide the required explanation for the ALJ’s [apparent] finding that [Tommy] needs a cane to ambulate but not for balance.” *Toni M. v. Bisignano*, No. 1:25cv559, 2026 WL 569821, at *3 (S.D. Ill. Mar. 2, 2026). Indeed, to whatever extent these findings support the ALJ’s conclusion that Tommy can stand for up to two hours without a cane, they equally support the conclusion that he can walk without a cane. *See, e.g.*, *Tracey H. v. Kijakazi*, No. 4:20cv40, 2021 WL 6071030, at *11 (W.D. Va. Dec. 23, 2021) (affirming that cane was not medically necessary for walking because claimant demonstrated normal gait and full range of motion). Absent further explanation, the Court is “left to guess” how the ALJ decided that the evidence supports contrary conclusions about related functions. *See Mascio*, 780 F.3d at 637.

The ALJ’s failure to reconcile conflicting evidence about Tommy’s cane use and to explain his contrary conclusions about standing and walking is particularly troubling because the VE testified that a limitation to using a cane while standing would eliminate all work at step five, requiring a finding of disability. *See* R. 65–66. The ALJ must consider all relevant evidence in coming to an RFC determination “and cannot simply cherrypick facts that support a finding of

nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869 (citation omitted). "Although the ALJ was not required to find a cane medically-necessary . . . , he was required to resolve the conflicting evidence and explain his reasons for declining to include the use of a cane [for standing] in the RFC assessment." *Molden v. Saul*, No. 1:19cv2576, 2020 WL 4013378, at *18 (D.S.C. July 16, 2020). Because it is unclear whether the ALJ considered evidence in the record indicating that Tommy needs a cane while standing and why the ALJ declined to find that Tommy needs a cane for that purpose, the Court cannot engage in meaningful substantial-evidence review. *See Brandon W. v. O'Malley*, No. 6:23cv17, 2024 WL 1886564, at *8–9 (W.D. Va. Feb. 21, 2024) (remanding where the ALJ apparently "disregarded, without explanation, that there is some evidence, even if minimal, that supports the fact that Brandon requires a cane or walker for balance, as well as ambulation"); *Snider v. Saul*, No. 1:18cv549, 2019 WL 4538559, at *5 (M.D.N.C. 2019) (remanding for the ALJ to "specifically explain in a manner susceptible to judicial review whether Plaintiff needed a cane for balancing" where the claimant "reported falls several times" and was considered a "fall risk" during the relevant period); *Jennifer S. v. Kijakazi*, No. 3:20cv50239, 2022 WL 279554, at *4 (N.D. Ill. Jan. 31, 2022) (remanding where "the ALJ's decision made no explicit findings about Plaintiff's use of a cane for balancing or standing, and the record cited by the ALJ [did] not implicitly support the conclusion that Plaintiff . . . only required [a cane] for ambulation"). *Cf. Randall W.*, 2020 WL 6939728, at *6 (remanding because it was "unclear whether the ALJ considered the Plaintiff's need for a cane, but rejected the need, or simply failed to consider the issue at all").

V. Conclusion

For the foregoing reasons, find that substantial evidence does not support the

Commissioner's final decision, and I respectfully recommend that the presiding District Judge **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** the case from the Court's active docket.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send copies of this Report and Recommendation to all counsel of record.

ENTER: August 13, 2026

Joel C. Hoppe
United States Magistrate Judge